# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**THOMAS E. JACKSON,**

                                      **CASE NO. 2:18-CV-00465**

    **Petitioner,**                       **CRIM. NO. 2:14-CR-00106(2)**

                                        **CHIEF JUDGE EDMUND A. SARGUS, JR.**

    **v.**                               **Chief Magistrate Judge Elizabeth P. Deavers**

**UNITED STATES OF AMERICA,**

    **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a federal prisoner, brings this Motion to Vacate under 28 U.S.C. § 2255. (ECF Nos. 184, 188.) This matter is before the Court on the motion and supplemental memorandum in support (ECF Nos. 184, 188), Respondent's Response in Opposition (ECF No. 193), Petitioner's Reply (ECF No. 194), supporting Affidavits and bank records (ECF Nos. 189, 197-99), and the exhibits of the parties. For the reasons that follow, the Undersigned **RECOMMENDS** that the Motion to Vacate under 28 U.S.C. § 2255 (ECF No. 184) be **DENIED** and that this action be **DISMISSED**.

## I. Facts and Procedural History

The United States Court of Appeals for the Sixth Circuit summarized the facts and procedural history of the case as follows:

> Jackson and his business partner, Preston Harrison ("Harrison"), founded Imperial Integrative Health and Research Development, LLC ("Imperial") to develop and market a sports beverage called "OXYwater." Jackson was the founder and CEO of Imperial, while Harrison was the president and founder. In 2010, Jackson and Harrison began looking for investors for OXYwater. Toward the beginning of their search for investors, Jackson and Harrison met with Robert Smith ("Smith"), who at the time owned a consulting company called Investors Capital Edge. Smith's job involved consulting with clients on how to build proper business plans, corporate credit, etcetera. During the initial meeting with Smith, Jackson told Smith that OXYwater was oxygen-enhanced, and that their goal was to raise about $8.5

million in capital. Jackson and Harrison initially contracted with Smith for him to perform consulting services for Imperial and OXYwater. Upon joining Imperial, Smith suggested that they increase the start-up amount to $9.5 million and recommended other changes to the Private Placement Memorandum ("PPM")—the document that provided the overview of Imperial, how funds would be raised, and how much each share would cost. Smith subsequently took on the more formal role of Chief Financial Officer of Imperial, where his focus was primarily on recruiting investors for OXYwater.

The PPM, which was given to a number of Imperial's investors, contained false information. The PPM listed as National Sales Manager Daniel Couts, a former employee of Coke and Vitaminwater, and also listed Kevin Waddle, Michael Skelton, and Matthew Godsey, all former Coke and Vitaminwater employees, as members of the OXYwater sales team, and included their resumes. None of these individuals, however, were ever employed by or associated with Imperial. The PPM further included a section on celebrity endorsements that listed OXYwater's official endorsers as well-known athletes, Manny Pacquiao and Gregory Jennings. These athletes were never officially affiliated with OXYwater or Imperial. Even further, the PPM indicated that in the first year, Jackson would receive a salary of $90,000 and Harrison a salary of $60,000. These numbers were subject to increase in subsequent years. Contrary to these representations, Jackson and Harrison were never officially on Imperial's payroll. Rather, Jackson used the Imperial accounts for his personal use, funneling significantly higher amounts than disclosed in the PPM to himself and Harrison. Finally, the PPM stated that the funds raised would be used for marketing, inventory, payroll, office warehouse lease, and to purchase machinery and commercial vehicles for local delivery to retail accounts. While some of the funds were used for legitimate business purposes, bank records indicated that the invested funds were also used by Jackson and Harrison for personal expenses. Based on the misrepresentations in the PPM and other oral communications, Jackson and Harrison received approximately $9.3 million in investments for Imperial and OXYwater.

In 2011, Jackson—who controlled all of Imperial's finances—transferred over one million dollars from Imperial accounts into an account listed under the name of ForeverNow, LLC ("Forever Now"). Forever Now listed Harrison and his wife, Lovena, as the only signatories to the account. The Harrisons used the Forever Now account as their personal account, purchasing personal items and paying for home improvement projects out of the account.

Following a joint investigation by the Federal Bureau of Investigation and the Internal Revenue Service, a federal grand jury, in May 2014, returned an indictment against Jackson and Harrison on various counts of wire fraud and money laundering. The grand jury also indicted Preston and Lovena Harrison for tax fraud and tax fraud conspiracy, and indicted Lovena for structuring currency transactions to evade reporting requirements.

Jackson was tried in an eight-day joint trial with co-defendants Preston and Lovena Harrison. In its case in chief, the prosecution presented evidence from twenty witnesses, including six investor victims. Following the prosecution's case, the defense rested without presenting any proof. The jury convicted Jackson of one count of wire fraud conspiracy, in violation of 18 U.S.C. § 1349; eight counts of wire fraud, in violation of 18 U.S.C. § 1343; one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and twelve counts of money laundering, in violation of 18 U.S.C. § 1957. The district court sentenced him to eighty-three months in prison and ordered restitution in the amount of $8,840,706.

*United States v. Jackson*, 662 F. App'x 416, 418-20 (6th Cir. 2016). On November 21, 2016, the Sixth Circuit affirmed the Judgment of this Court. *Id.* On May 15, 2017, the United States Supreme Court denied Petitioner's petition for a writ of *certiorari*. *Jackson v. United States*, -- U.S. --, 137 S.Ct. 2119 (2017).

On May 11, 2018, Petitioner filed this Motion to Vacate under 28 U.S.C. § 2255. He asserts that he was denied the effective assistance of counsel because his attorney failed to move to withdraw or join his motion for new counsel despite a conflict of interest (claim one); because his attorney failed to move for a severance of charges or a mistrial following admission of unfairly prejudicial and inflammatory evidence against co-defendants that was not admissible against him (claim two); because his attorney was verbally abusive and hostile, accused him of crimes not charged, failed to present evidence, favored victims' feelings over her duty to advocate, and assisted the government in its prosecution of its case (claim three); because his attorney failed to seek a two-week delay of sentencing so that his offense level would be reduced two levels under an amendment to the United States Sentencing Guidelines (claim four); and because his attorney failed to introduce evidence at sentencing to challenge the government's loss figures (claim five). It is the position of the Respondent that none of Petitioner's claims provide a basis for relief.

## II. Standard of Review

In order to obtain relief under 28 U.S.C. § 2255, a petitioner must establish the denial of a substantive right or defect in the trial that is inconsistent with the rudimentary demands of fair procedure. *United States v. Timmreck*, 441 U.S. 780 (1979); *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (*per curiam*). Relief under 28 U.S.C. § 2255 is available when a federal sentence was imposed in violation of the Constitution or laws of the United States or when the trial court lacked jurisdiction, when the sentence was in excess of the maximum sentence allowed by law, or when the judgment or conviction is "otherwise subject to collateral attack." *United States v. Jalili*, 925 F.2d 889, 893 (6th Cir. 1991). In the absence of constitutional error, the question is "whether the claimed error was a 'fundamental defect which inherently results in a complete miscarriage of justice.'" *Davis v. United States*, 417 U.S. 333, 346 (1974) (quoting *Hill v. United States*, 368 U.S. 424, 428–429 (1962)); *see also Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2006). However, "'[a] § 2255 motion may not be used to relitigate an issue that was raised on appeal absent highly exception circumstances.'" *DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996) (quoting *United States v. Brown*, 62 F.3d 1418 (6th Cir. 1995) (unpublished)). Further, if a petitioner fails to raise a non-constitutional claim at trial or on direct appeal, he or she has waived the matters for collateral review except where the errors amount to something akin to a denial of due process. Accordingly, claims that could have been raised on direct appeal, but were not, will not be entertained on a motion to vacate under § 2255 unless the petitioner shows: (1) cause and actual prejudice sufficient to excuse his failure to raise the claims previously; or (2) that he is "actually innocent" of the crime. *Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013) (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)) (internal citations omitted).

### III. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that counsel's performance was deficient, or that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed" by the Sixth Amendment, and that this deficient performance prejudiced the petitioner. *Id*. at 687. This showing requires that defense counsel's errors were so serious as to deprive the defendant of a fair and reliable trial. *Id.*

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 599 U.S. 356, 371 (2010). Given the difficulties inherent in determining whether an attorney's performance was constitutionally deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . ." *Strickland*, 466 U.S. at 689. Nevertheless, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. Therefore, a petitioner must also establish prejudice in order to prevail on a claim of ineffective assistance of counsel. *Id*. at 692.

In order to establish prejudice, a petitioner must demonstrate that a reasonable probability exists that, but for counsel's errors, the result of the proceedings would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. Because a petitioner must satisfy both prongs of *Strickland* in order to demonstrate ineffective assistance of counsel, should a court determine that the petitioner has failed to satisfy one prong, it need not consider the other. *Id*. at 697.

## A. Claims One and Three

In claim one, Petitioner asserts that his attorney performed in a constitutionally ineffective manner by failing to join Petitioner's request for new court appointed counsel or file a motion to withdraw based on her alleged conflicts with him and inability or refusal to advocate for the defense. Petitioner complains that his attorney told him that he should have expected to be indicted, tried to persuade him to plead guilty before investigating the case,[1] acted in a disrespectful and condescending manner, and refused to respond to Petitioner's e-mails or provide him with a copy of discovery material. He notified her several times, via e-mail, prior to trial of his dissatisfaction with her representation, but she did not respond. (*Affidavit of Thomas Jackson,* ECF No. 189-1, PAGEID # 5650, 5652.) In claim three, Petitioner similarly claims that his attorney acted in a verbally abusive and hostile manner, failed to present evidence, complained that she was not being paid enough money to represent him, refused to listen to him, inappropriately laughed during the government's case,[2] failed to prepare a defense, falsely stated that Rowland Hanson did not want to testify as a defense witness,[3] incorrectly responded to a question from the jury, and generally failed to advocate for the defense. He complains that his attorney refused to cross-examine prosecution witness Liam Culman, and prejudiced him through her cross-examination of other witnesses. (*Affidavit of Thomas Jackson*, ECF No. 189-1, PAGEID # 5662-63; *see also Memorandum of Law and Argument in Support of Motion for*

---

[1] Petitioner states that his attorney told him that the government had a "slam dunk" case against him, and that she did not want to see him go to prison for the next ten years, and urged him to accept the government's plea offer. (*Affidavit of Thomas Jackson*, ECF No. 189-1, PAGEID # 5650.)

[2] Petitioner complains that his attorney laughed during the testimony of Special Agent David Gosiewski at a pre-trial hearing on his motion to suppress. (*Affidavit of Thomas Jackson*, ECF No. 189-1, PAGEID # 5652.)

[3] *See Affidavit of Thomas Jackson*, ECF No. 189-1, PAGEID # 5662.

*Relief Under 28 U.S.C. § 2255*, ECF No. 188, PAGEID # 5600-5601.)  He further complains that

defense counsel failed to argue that the defendants had produced a legitimate product that would

have been profitable had they not been forced into bankruptcy, and never claimed that

OXYwater contained extra oxygen, but truthfully informed investors that consumption of

OXYwater increased blood oxygen levels based on a pilot study from the Ohio State University

by Dr. Steven Devor.  (PAGEID # 5653-54.)  Petitioner complains that his attorney failed to call

Derrick Flood as a defense witness to support this defense; failed to present evidence to show

that the defendants had arranged for distribution of OXYwater in various stores, including Whole

Foods, Walgreens, Discount Drug Mart, Jungle Jims, Giant Eagle, Meyers, Stagnaro

Distributors, Cox Distributing, and Kroger, and that OXYwater had been named the official

health beverage of the Cleveland Cavaliers and Lake Erie Monsters.  The defendants also had

reached a sponsorship agreement with the Texas Rangers and drivers of NASCAR.  (PAGEID #

5655-56.)  He complains that defense counsel failed to present evidence indicating that Robert

Smith, and not the defendants, illegally prepared and used the false PPM to induce investments,

and continued to do so until Petitioner fired him.  Petitioner complains that his attorney failed to

argue that some of the alleged victims, such as Kevin Foster, Shaffer Chimere Smith (a.k.a., Ne-

Yo), and Liam Culman did not rely on the false PPM when making their investments.  (PAGEID

# 5657-58.)  He complains that his attorney also failed to present evidence indicating that he did

not hide or steal any of the company's funds, but only received appropriate salary disbursements.

(PAGEID # 5659.)  He complains that defense counsel failed to show that the defendants opened

the "Forever Now" bank account, because they could not open personal accounts, and use of that

account did not involve any illegal intent to defraud investors.  (PAGEID # 5660.)  He further

complains that his attorney improperly failed to call David Graham and Rowland Hanson as

defense witnesses. (PAGEID # 5662.) Petitioner has attached various documents in support, including an OXYwater Pilot Research Project summary by Professor Steven Devor (ECF No. 189-2, PAGEID # 5664-69); a letter from Derrick Flood dated April 23, 2018, regarding his employment with Imperial Integrative Health, LLC., from April 2012 through June 2013 (PAGEID # 5671-74); a purchase order (PAGEID # 5675); a Cox Distribution Agreement (PAGEID # 5676-77); a Certificate of Liability Insurance (PAGEID # 5678); a letter from Matt Newcom, owner of Kettle Fish Marketing, regarding negotiations with OXYwater in July 2012 (PAGEID # 5679); a letter from the Cleveland Cavaliers expressing interest in continuing conversations with OXYwater (PAGEID # 5680); a press release dated October 2012, indicating that OXYwater had been named official health beverage of the Cleveland Cavaliers and the Lake Erie Monsters (PAGEID # 5681-82); a sponsorship agreement dated March 13, 2013, between Imperial Integrative Health Research & Development LLC and Rangers Baseball, LLC (PAGEID # 5689-96); and documents regarding interest from the Modern Regional Center (PAGEID # 5697-99). Petitioner asserts that, had his attorney acted in an objectively reasonable manner, she would have requested to withdraw, and he would have obtained a new court-appointed attorney. (ECF No. 194, PAGEID # 5745.) Petitioner has submitted his own Affidavit (ECF No. 189-1), and Second Affidavit in response to Respondent's Response in Opposition.[4] (ECF No. 197-1.)

In response, Respondent has submitted an Affidavit from Attorney Diane Menashe, Petitioner's former defense counsel. She denies that she complained about her payment for her services as court appointed defense counsel, or that she failed to prepare a vigorous defense. She

---

[4] Petitioner has also attached a copy of the grievance that he filed against Attorney Menashe (ECF No. 197-2, PAGEID # 5766-72), and e-mails that he sent to defense counsel regarding the case and his defense against the charges. (PAGEID # 5774-90; 5800-04.)

states that she provided Petitioner with a complete copy of all discovery material, and corresponded with him regularly via e-mail. Petitioner never requested any discovery material that he had not received. Her billing records reflect that she spent 38.3 hours conducting interviews and conferences in the case, and at least half of that time consulting with Petitioner. She spent 67.5 hours obtaining and reviewing records. She conducted 136.1 hours of investigative and other work, preparing for trial. She worked closely with Attorney Kort Gatterdam, former attorney for the co-defendant, Preston Harrison, in establishing and preparing a defense. Menashe denies making derogatory comments to Petitioner or Harrison. She denies expressing her belief regarding his guilt, and states that she would not have done so, as a matter of her trial practice. (*Affidavit of Diane Menashe,* ECF No. 193-1, PAGEID # 5727-30.)

Attorney Menashe further indicates as follows:

> It is accurate to say that there were moments during meetings with Jackson when our conversations were heated. I confronted Mr. Jackson regularly about the irregularities between his version of events and the evidence. . . . I recall Jackson not wanting to hear any reality other than his own. An example is when Jackson refused to attend a reverse proffer that Gatterdam and I set up with the government saying that he wasn't interested in what evidence they had. The reverse proffer included the government showing us the "machine" that Jackson and Harrison used to create the drink Oxy Water. Despite my best efforts, Jackson refused to attend that reverse proffer.

(PAGEID # 5730-31.) She reviewed with Petitioner the government's October 6, 2014, plea offer at length. He declined to accept that offer. The defendants hired defense investigator Kathy Koch, who interviewed Bruce Burge, Matt Newcom, Scott Bigler, Richard Senn, and Cyndyney Whitmoyer. (PAGEID # 5731.)

> A number of other witnesses either couldn't be located or refused to consent to an interview. . . . I gave copies of the investigative write-ups done on each/every witnesses to Jackson for his review.

> Gatterdam and I personally interviewed expert/professor Steve Devor on Friday January 3, 2015 at this office on the Ohio State Campus.

Per my client's request I personally interviewed Rowland Hanson ("Hanson"), via telephone, for over an hour on November 9, 2014. Gatterdam then interviewed Hanson himself in March of 2015.

On March 13, 2015 Gatterdam and I emailed Hanson to let him know we wouldn't be calling him as a witness given the damaging information he had about our clients. Hanson replied that same day via email, "I think that is the best decision. I do not want to be put in a position where my testimony could hinder your defense." I have that email.

Pre-trial Gatterdam and I discussed at length, on several occasions, which witnesses to call, or not call, at trial. . . .

Throughout the trial Jackson and I sat next to each other and communicated with each other on a regular, on-going basis.

At trial, after defense closing arguments Jackson wrote and then passed me a note while we were all at counsel table that reads "You were amazing! Kort too!" I have that note.

\*\*\*

Jackson filed a disciplinary complaint against me on March 10, 2018. That claim was summarily dismissed by the Ohio State Supreme Court via letter to Jackson on March 20, 2018. . . .

Jackson chose to not return my emails, calls and letters. That however did not stop me from sending them or making them. Up until trial and even after trial I emailed Jackson regularly, updated him on witness developments and otherwise kept him in the loop about case progress.

Jackson's refusal to communicate with me had no impact on my zealous advocacy on his behalf. . . .

I was completely and thoroughly prepared for trial in this matter. . . . Weeks of time and effort were spent working on this case, preparing for trial.

(PAGEID # 5731-33.)

### Petitioner's Request for New Counsel

The United States Court of Appeals for the Sixth Circuit rejected Petitioner's claim that the Court improperly denied his request for new counsel based on alleged conflicts:

On the first day of Jackson's trial, counsel for co-defendant Harrison, Mr. Gatterdam, informed the district court that they had just learned that Jackson had filed a disciplinary complaint against his counsel, Ms. Menashe, and that Jackson did not want to proceed with her as counsel. Ms. Menashe stated that she had not received a copy of the complaint, and that she had no prior knowledge of it. In response to questions from the court, Jackson stated that while he had only filed the disciplinary complaint approximately a week before, he felt like he had not had adequate counsel from the start. Jackson stated that there was a lack of communication between him and Ms. Menashe and that he had lost trust in her. Particularly, Jackson stated that he believed Ms. Menashe thought that he was guilty because of the way she spoke to him, that she was refusing to investigate and introduce financial information that would give him "credibility in terms of the company financials," and that he thought she was working with the prosecution against him because of a plea agreement that she presented him within a week of his arraignment.

Upon inquiry by the court, Ms. Menashe stated that while she received a plea offer early on in the case, it was not within a week of the arraignment, and that it was submitted so early because the AUSA assigned to the case at the time was leaving the office and there were time constraints. Ms. Menashe also stated that she has an "aggressive personality" and that while she tends to not use the most flowery language, she had never told Jackson that she was "going to nail his butt." With respect to the breakdown in communication, Ms. Menashe stated that while verbal communication had slowed down, she had exchanged voluminous emails with Jackson, Harrison, and Mr. Gatterdam. According to Ms. Menashe, she would have liked to discuss with Jackson certain documents produced by the prosecution and whether he should testify, but in the past week Jackson had skipped a planned meeting and stopped returning her calls. Regardless, Ms. Menashe stated that there was ample time to do those things before the defense would have to present its case, and that she believed she was prepared to go forward with trial despite the communication issues. Finally, Ms. Menashe stated that with regards to the ledgers and financial documents that Jackson referred to, she did not believe that she could ethically introduce those documents because she could not properly authenticate them.

Mr. Gatterdam, Harrison's lawyer, also spoke to the court. Importantly, he noted that he too had concerns with introducing the ledgers, which were supposedly prepared by Mr. Kevin Foster, who at one point was going to be considered an unindicted co-conspirator, and who was also a named defendant in a related civil suit. Mr. Gatterdam also noted that he had been in meetings with Ms. Menashe and the defendants, and while she was direct, he did not believe that she had ever been unprofessional.

The court also heard from the prosecution that it had "devoted tremendous resources to getting this case ready to go today" and that the prosecution believed

that Jackson's complaint was a ploy to not go forward at that time. Following the prosecution's statement, the district court made the following findings:

> Well, as many cases have stated in the past in Court of Appeals decisions, the right to counsel of choice, unlike the right to counsel, is not absolute. And the [c]ourt generally goes through several considerations when this issue arises. And the first one is the timeliness of any motion or request. And this comes the morning of trial. The timeliness of this is, first of all, dilatory and, second of all, suspect.

> From, or, with regard to what it is that the defendants are complaining of, well, my notes indicate that they believe they're, whatever this means, underrepresented or they believe that their attorneys believed that they were guilty from the start; there was this issue concerning plea agreements; that there have been harsh words as far as dialogue between counsel and the defendants are concerned. They indicate—defendants indicate that communication has broken down, that there has been a lack of investigation. And then there is this issue of financial ledgers. That seems to encapsulate that which the defendants are complaining of here this morning.

> First of all, with regard to the defendants feeling guilty—feeling that their attorneys believe they were guilty from the start, that's not an unusual position for defendants to find themselves in when they discuss matters with their counsel. In fact, I'd be surprised if many times that doesn't happen simply because counsel has to be critical with regard to the presentation of their case to make sure that they don't fall into a trap.

> With regard to the plea agreements, well—yeah. I'm glad to know that counsel has presented the plea agreements as they come along to counsel, or, to the defendants. The fact that those plea agreements were not accepted kind of speaks to itself, but the bigger problem I've had in the past is when plea agreements and negotiations from the government to defense counsel have not been forwarded to the defendants. And that's not the case here. In fact, I don't see any issue here with regard to these plea agreements being presented to the defendants.

> On the other hand, I find that they have—the defense counsel has tried to get these to counsel and to the defendants in a timely manner because they were under a deadline, apparently to get an answer.

With regard to the dialogue between the defendants and counsel, I'm familiar with all three counsel, all three defense counsel. I'm very familiar with Ms. Menashe and Mr. Gatterdam's representation of clients not only in the state court proceedings but in federal court proceedings. I have had them appear before me, for probably the last 15 years, in different cases, including murder cases.

I consider the two of them, [Ms.] Menashe and Mr. Gatterdam, to be two of the best criminal attorneys, defense attorneys, in central Ohio. I have noticed in the past, but I don't find this to be a criticism, that they are very blunt with regard to their representation of the defendants because they have to be. And whether the defendants like that dialogue or not is of little consequence here today.

Let me just say defense counsel are not—are not to be lackeys for the defendants.
With regard to the breakdown in communication, I find this to be almost laughable. The breakdown of the communication has been self imposed [sic]. The defendants, themselves, have stopped talking to the defense counsel. I don't see that as a problem here. I mean, I see that as a problem, but it's not a problem of counsel.

There seems to be this whole issue of corporate financial ledgers. I will say, just for the defendants' sake, there are issues involved with regard to evidentiary matters. And I'm not sure what these ledgers are or what we're referring to, but I trust defense counsel when they tell me that there are issues in their mind with regard to the presentation of these corporate financial ledgers. They are schooled and trained in the rules of evidence. The defendants are not.

So, I have tried to go through each of these complaints, if you want to call them that, that the defendants have made; and I don't see where this is a problem of defense counsel. I think there is more of an issue here involving the self-imposed communication breakdown that the defendants have created. And I would suggest that they begin to communicate with their counsel in this matter.

I have to balance the public's interest in a prompt and efficient administration of justice. And that balance tips in favor of not granting any request of the defendants for new counsel at this time.

As Mr. Young [counsel for the government] has stated, you have witnesses coming in from all over the United States. The parties have worked hard, and that includes the defense counsel. I'm aware of that because I have reviewed their exhibit books, their witness lists and so forth, and I understand that they have met on several

occasions with the government to discuss evidentiary issues and try to resolve some of those.

But what I'm getting at is, we're set for trial today. We have prospective jurors, many more than I normally have, ready to go here. And we have witnesses coming in and matters lined up for the next two weeks. I have to balance that against the defendants' what appears to be a right to counsel of choice, and the balance tips quickly and convincingly on behalf of proceeding here today.

The request, if that's what this is, and I believe it is—the request of the defendants for a continuance to obtain new counsel is denied.

(R. 139, PageID # 3522–26.)

## B. ANALYSIS

We review a district court's denial of a motion to substitute counsel for abuse of discretion. *United States v. Marrero*, 651 F.3d 453, 464 (6th Cir. 2011) (citing *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007)). The Court will consider the following four factors to determine if a reversal is warranted:

(1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in prompt and efficient administration of justice.

*United States v. Trujillo*, 376 F.3d 593, 606 (6th Cir. 2004) (quoting *United States v. Mack,* 258 F.3d 548, 556 (6th Cir. 2001)).

All four factors weigh heavily against Jackson and in favor of the district court's decision to deny substitution of counsel. First, timeliness: Jackson filed his disciplinary complaint against counsel approximately a week before the first day of trial. However, he did not inform the court or his counsel about this complaint. Instead, Jackson waited until the day of trial to inform the court that he wanted substitute counsel. This Court has repeatedly upheld the finding of untimeliness in cases involving longer periods than is present here. *See, e.g., Trujillo*, 376 F.3d at 606–07 (finding that a motion for substitution of counsel filed three days before the start of trial as untimely); *United States v. Williams*, 176 F.3d 301, 314 (6th Cir. 1999) (upholding a finding of untimeliness where the defendant requested new counsel two weeks before trial); *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996) (concluding that a motion for substitution of counsel, filed the day before trial, was untimely). Jackson attempts to justify the delay in requesting substitute counsel by stating that he did not know until the eve of trial that his lack of communication with his attorney would have an unfavorable impact on his case.

(Appellant Br., at 46.) This argument is unpersuasive for two reasons: (1) Jackson informed the district court that he felt like he had not had adequate counsel from the start; and (2) even after filing the disciplinary complaint, Jackson still waited over a week to inform the court of his dissatisfaction with counsel. Despite appellate counsel's laudable attempt at oral argument to minimalize the failure to satisfy this factor, it is clear that the district court did not abuse its discretion in finding that the motion was untimely.

Second, the Court looks at the adequacy of the district court's inquiry into the matter. "[T]o meet this requirement, the district court simply must allow a defendant the opportunity to explain the attorney-client conflict as he perceives it." *Marrero*, 651 F.3d at 465 (citing *United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009)). The record indicates that the district court engaged in a lengthy discussion with Jackson and gave him the opportunity to detail the alleged conflict between him and his attorney and his concerns with her representation of him. The district court also heard from Jackson's attorney, co-defendant Harrison, and Harrison's attorney. During these exchanges, Jackson was given the opportunity to air his grievances and counsel was given an opportunity to respond. It appears from the record before the Court that the district court satisfied its obligation to inquire into Jackson's complaint.

The Court next looks at the nature of the conflict between the attorney and the client. Jackson listed, as reasons for his dissatisfaction with counsel, lack of communication and trust stemming from his belief that his counsel thought he was guilty, her use of harsh words to him, her presentation of a plea agreement to him early on in the case, and her refusal to introduce evidence at trial that he wanted her to. The district court addressed each of defendant's complaints, finding it was not unusual for defendants to feel like their lawyers believe they are guilty; that because defense counsel are not supposed to be lackeys for defendants, counsel's blunt nature is not a reason for substitution of counsel; and that because counsel are schooled in matters of evidence, Ms. Menashe's and Mr. Gatterdam's conclusions regarding the ledgers defendants wanted them to introduce were persuasive. Ultimately, the district court discounted defendant's claim of a breakdown in communication, finding that it was completely self-imposed. This Court has previously held that "a lack of communication resulting from a defendant's refusal to cooperate with his attorney does not constitute good cause for substituting counsel." *Marrero*, 651 F.3d at 466 (citation omitted). The district court's conclusions here were not unreasonable or an abuse of discretion.

Finally, the Court must weigh the first three factors against the public's interest in the prompt and efficient administration of justice. That Jackson loses in this balancing of factors is clear. Given that the motion was made on the day trial was set to begin, the jurors were already present and the prosecution had already expended resources to have witnesses and members of its prosecution team—who were not from Ohio—present and ready to begin trial. Even further, Jackson's counsel stated that she was prepared to proceed with trial, and that there was still

enough time for her and Jackson to complete their unfinished collaborative tasks, since it would be a week before the defense presented its case in chief. As such, the district court did not abuse its discretion in concluding that the public's interest in the prompt efficient administration of justice weighed in favor of denying the motion to substitute counsel. *See Trujillo*, 376 F.3d at 607. For these reasons, we find that the district court's denial of Jackson's motion to substitute counsel was not an abuse of discretion.

*Jackson*, 662 F. App'x at 420-24.

Thus, this claim will not again be considered by this Court. "It is well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law." *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999).

Petitioner maintains that he has raised new and distinct claims of ineffective assistance of counsel that may nonetheless be addressed in these proceedings. Specifically, he asserts that his attorney performed in a constitutionally ineffective manner by failing to join in his request for new counsel or file a motion to withdraw, and argues that he was prejudiced thereby because he was unable to obtain the appointment of new counsel. (*Reply Memorandum in Support of Motion for Relief Under 28 U.S.C. § 2255*, ECF No. 194, PAGEID # 5745-46.) Alternatively, Petitioner argues that his claim that the Court improperly refused to appoint new counsel may again now be addressed due to the inadequate development of the record for proper consideration of the claim on direct appeal, his lack of representation by new counsel at the hearing on his request for new counsel, and in view of the subsequent supplementation of the record with Affidavits from the Petitioner and his co-defendant, Preston Harrison, and a Notice of Filing of Redacted JPMorgan Chase Bank Records of Accounts other documents. (See ECF Nos. 197-199.) Petitioner argues that this supplemented record shows that the Sixth Circuit improperly dismissed his claim because he had twice requested his attorney to withdraw and she ignored his

requests, he has submitted an Affidavit alleging that she failed to conduct adequate investigation of the case, and Roland Harrison has corroborated that defense counsel acted in an abusive and improper manner.[5] (*Reply Memorandum in Support of Motion for Relief under 28 U.S.C. § 2255*, ECF No. 194, PAGEID # 5742.)

However, nothing prevented Petitioner from raising these same arguments in the Sixth Circuit or, alternatively, from raising his claim of the denial of the effective assistance of counsel in the first instance in an action under 28 U.S.C. § 2255. *See Haynes v. United States*, No. 07-20639, 2014 WL 103216, at *10 (E.D. Mich. Jan. 10, 2014) (noting ineffective assistance of counsel claims "may be brought in a collateral proceeding under § 2255 whether or not the petitioner could have raised the claim on direct appeal.") (citing *Massaro v. United States*, 538 U.S. 500, 504 (2003)); *see Zertuche v. United States*, Nos. 2:15-cv-02284-JPM-dkv, 2:12-cr-20190-JPM-3, 2017 WL 6811994, at *15 (W.D. Tenn. Sept. 13, 2017) (holding that a conflict of interest claim is a type of ineffective assistance of counsel claim that may be litigated in the first instance in a motion to vacate under § 2255). Petitioner's failure to do so does not constitute exceptional circumstances warranting reconsideration of the same claim that the Sixth Circuit

---

[5] Petitioner's reference to "Roland" Harrison appears to be a typographical error. Petitioner has submitted an Affidavit from co-defendant Preston J. Harrison. (Doc. 198-1, PAGEID # 5806.) Harrison indicates that when he first met Attorney Diane Menashe, she said, "What's up dog?" She refused to argue that the defendants opened the "Forever Now" bank account because "Chexsystems" prevented them from opening personal checking accounts, and failed to cross-examine IRS agent David Gosiewski on the issue. She told Harrison, "If you guys had such terrible credit, what the hell were you trying to start a business for?" She threatened to have Harrison arrested for disobeying the instructions of an officer of the court by failing to respond to her e-mails. Harrison had to ask Dennis McCafferty to intervene on his behalf. Harrison did not observe Menashe provide Petitioner with any of the discovery material. Harrison gave Petitioner copies of all of his discovery documents. Menashe belittled the Petitioner and spoke disrespectfully to both of the defendants. She told them that nobody would believe them and they should just admit that they started the company to line their pockets. She spoke loud and aggressively. She told Harrison that if he knew so much about the law then he would not have broken it. (PAGEID # 5807-10.)

has already considered, and rejected. Thus, to the extent that Petitioner again asserts that the Court improperly denied his request for new court-appointed trial, the Court will not address that issue here.

Petitioner does raise other issues regarding ineffective assistance of counsel, and asserts that his attorney performed in a constitutionally ineffective manner by failing to join in his request for new counsel or file a motion to withdraw. These claims have not already been addressed by the Sixth Circuit, and therefore may be considered in these proceedings. "[A]nalytically distinct" claims may be addressed in a motion to vacate under § 2255. *Hestle v. United States*, 426 F. App'x 366, 367-68 (6th Cir. 2011). Nonetheless, for the reasons that follow, the record provides no basis for relief.

The record reflects overwhelming evidence of guilt. To the extent Petitioner views the matter as evidence of deficient representation, in view of the overwhelming evidence of guilt, defense counsel did not act in a constitutionally ineffective manner by advising Petitioner to enter a guilty plea, and thereby reduce his potential prison exposure. *See Hutchinson v. United States*, Nos. 2:15-cv-17, 2:12-cr-00079, 2016 WL 7029277, at *4 (S.D. Ohio Sept. 1, 2016) (citing *Rodriguez v. Warden, S. Oh. Corr. Facility*, 940 F. Supp. 2d 704 (S.D. Ohio 2013) ("[I]n light of the strong evidence against Petitioner, it was reasonable trial strategy for his counsel to recommend that he take the state's plea offer instead of filing a motion to suppress.") (citing *Premo v. Moore*, 562 U.S. 115, 118-132 (2011) (finding no ineffective assistance by counsel for conducting plea negotiations prior to filing a motion to suppress); *see also Murphy v. United States*, No. 2:14-cv-1706, 2016 WL 2735934, at *19 (S.D. Ohio May 11, 2016) (noting that an "attorney does not perform in a constitutionally ineffective manner by urging his client to plead guilty in light of overwhelming evidence of guilt, or when it is the opinion of the attorney that entry of a guilty plea

would be in the best interest of his client.")  "Indeed, this is a function of an attorney representing a criminal defendant, and the failure to do so would be an abrogation of one of the duties of defense counsel."  *Murphy v. United States*, 2016 WL 2735934, at *19 (citing *Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003) (an "attorney may provide an opinion on the strength of the government's case, the likelihood of a successful defense, and the wisdom of a chosen course of action," however, "the ultimate decision of whether to go to trial must be made by the person who will bear the ultimate consequence of a conviction.")

Robert Smith testified that he had no access to the Imperial's books or records, although he asked to see them repeatedly.  He knew nothing about the "Forever Now" bank account that Petitioner and Harrison used to disburse company funds.  (*Transcript, Vol. II*, ECF No. 140, PAGEID # 3678-79; 3688-89.)  Petitioner specifically requested that Smith revise the Private Placement Memorandum ("PPM") to include false misrepresentations.  For example, the defendants provided Smith with the names of former Vitamin Water employees to include in the PPM that purportedly would be working at Imperial, as well as their biographical material, and informed Smith of the amount of their respective salaries.  (PAGEID # 3683, 3687.)  Smith cautioned Petitioner not to include any false information in the PPM.  (PAGEID # 3684.)  Further, Petitioner participated with Smith in presenting this false information to potential investors. (PAGEID # 3680.)  For example, Petitioner and Smith met with Kevin Foster, giving him the same presentation that they gave to other investors, falsely informing him that OXYwater was "oxygen enhanced" water, and claiming that former Vitaminwater employees would be working with Imperial.  (PAGEID # 3691-92.)  Foster represented Shaffer Smith, a.k.a., Ne-Yo, Eric Fondue, and others.  (PAGEID # 3693.)

Investors relied on Petitioner's false representations before deciding to invest in the company. For example, Aaron Stumpf had lengthy discussions with the Petitioner via e-mails, phone calls, and meetings before investing in the company. Petitioner specifically told Stumpf that OXYwater contained enhanced levels of oxygen.

> Q. How many times did Mr. Jackson tell you that OXYwater was enhanced with oxygen?
>
> A. More times than I could give a number for. I mean, it was the differentiating factor between this product and what was already out on the market.
>
> ***
>
> I never. . . got the full process explained, other than there was a process that he was part of the formulation, that only a few people knew how it was made, and that's what separated it from the competitors.

(PAGEID # 3739-40.) Petitioner also told Stumpf that Petitioner would be paid a salary of $90.000.00, and Harrison would be paid $60,000.00. (PAGEID # 3741.) Petitioner gave Stumpf the PPM containing material false misrepresentations. (PAGEID # 3743.) Petitioner told Stumpf that former Vitaminwater employees worked for OXYwater. (PAGEID # 3645-47.) Petitioner told him that Greg Jennings, Many Pacquiao, and others, would be endorsing the product. (PAGEID # 3747.) Petitioner told Stumpf that none of Stumpf's investment money would be spent until they had raised $9.5 million, and then it would be used for marketing and promotional material. (PAGEID # 3750.) When Stumpf later requested to view the company's financial documents, Petitioner refused to provide him with such material, until Stumpf hired an attorney. (PAGEID # 3763-64.) Ultimately, Stumpf received tax documents from Petitioner indicating that

Stumpf had invested $6,250.00, when he had actually invested $125,000.00.  (PAGEID # 3764-65.)[6]

William Kendrick Gregory testified that Petitioner told him OXYwater "was an oxygenated water that took a lot of science" involving infusing the water with extra oxygen. (*Transcript, Vol. I*, ECF No. 139, PAGEID # 3569.)  Gregory discussed the contents of the PPM with Petitioner prior to investing, which falsely identified Daniel Couts, Kevin Waddle, Michael Skelton, and Matthew Godsey, former members of Coke and Vitaminwater, as employees with the company (PAGEID # 3573-75), and listed Petitioner's compensation as $90,000.00.  (PAGEID # 3585.)  Petitioner told Gregory that they had obtained endorsements from Greg Jennings, Plaxico Burress, Manny Pacquiao, and Eric Weems, and others.  (PAGEID # 3588.)  Petitioner promised Gregory that Gregory would get half of his initial investment back once they raised $ 9.5 million, and his shares would not be diluted.  Gregory never received any of his money back.  (PAGEID # 3594-95.)  Gregory later discovered that his investment money was transferred to the "Forever Now" bank account for the defendants' personal use.  (PAGEID # 3616.)

Kendra Bowers did the bookkeeping and accounts for Imperial from September 2011 to April 2013, when the company went into receivership.  (PAGEID # 3812-13, 3817.)  Petitioner told her not to enter certain financial figures, such as payroll, production run cost, cost of events, and travel costs, into the company's books, so as to keep this information confidential.  (PAGEID

---

[6] Information regarding the study by Robert Devor at the Ohio State University (Defendant's Exhibit 2), to which Petitioner refers, came in through cross-examination.  (*Transcript, Vol. II*, ECF No. 140, PAGEID # 3786-90.)  Petitioner sent Stumpf a copy of the report, and Stumpf met with Devors.  Stumpf testified that the study looked at 12 people, put them on a treadmill, and asked them whether they preferred tap water or OXYwater, they chose OXYwater, which was flavored.  (PAGEID # 3792.)  He testified that the study had to do with whether OXYwater hydrated better than tap water.  "So I believe that they were taking that claim, saying it hydrated better, or the participants drank more of it."  (PAGEID # 3793.)  "And they [] had a statistical analysis of how much better it was than tap water, according to Dr. Devor[.]"  (*Id.*)

# 3819.)  Petitioner asked Bowers to pay his mother's past due property taxes from Imperial's bank account.  (PAGEID # 3819.)  Nobody told Bowers about the "Forever Now" bank account. (PAGEID # 3821-22.)  Petitioner would not permit Bowers to review the company's bank statements.  He told her that she did not need to know everything, and the less she knew, the better. (PAGEID # 3823.)  Ultimately, Bowers obtained the company bank statements from Chase bank. (PAGEID # 3824.)  At that time, she discovered that purchases had been made from the company's account for bills from Qdoba Restaurant, Toys R Us, Walmart, Donatos, Arbys, and other similar items.  (PAGEID # 3825.)  Petitioner began to delay paying Imperial's bills almost immediately, and more frequently between May and June 2012.  (PAGEID # 3825-26.)  The company paid for the travel and hotel rooms of models to attend OXYwater events.  (PAGEID # 3829.)  These expenses were between five and ten thousand dollars each, five to seven times a year.  Petitioner authorized such expenditures.  (PAGEID # 3829-30.)  For example, one invoice for an OXYwater launch party was $38,000.00.  (PAGEID # 3830-31.)  Petitioner also directed Bowers to record false information about sales of OXYwater on company spreadsheets.  (PAGEID # 3842-52.)

Richard Elder, an employee with Huntington National Bank, testified that the "Forever Now" bank account opened as an account for a child development business, with $660,000.00 in funds, listing its annual sales as $100,000.00.  (PAGEID # 3891.)  The account closed on May 2, 2012.  (PAGEID # 3892.)

Petitioner hired Meredith Bailey to work for Imperial in early 2012.  (*Transcript, Vol. III*, ECF No. 141, PAGEID # 3936.)  Bailey prepared reports for Petitioner on company expenses. (PAGEID # 3936-37.)  Derrick Flood, the general manager, provided Bailey with money to make deposits.  (PAGEID # 3940.)  Bailey noticed on the company's bank statements a Saks Fifth Avenue transaction in the amount of approximately $10,000.00, purchases from Kohl's and

Macys, and a bed charge.  Petitioner was the only person authorized to use that account.

(PAGEID # 3941.)  Petitioner's wife signed a check with his name to purchase a Christmas

present for a family member.  (*Id*.)  Baily told Petitioner that he need to make those types of

expenditures from his salary, and not the company account, and he agreed.  (*Id*.)  She gave tax

information provided to her by the Petitioner to the accountants, Mike Blankenbecker and Jon

Rryzenga.  (PAGEID # 3942.)  Petitioner provided the investment figures for capital

contributions made by investors for the 2011 corporate tax returns.  (PAGEID # 3944.)  The

numbers changed from 2 to 3 million dollars.  Petitioner ultimately decided to go with the $2

million figure.   (PAGEID # 3946, 3951.)    The K-1 figures he provided also fluctuated greatly.

(PAGEID # 3951-52.)  When the investors finally received their Schedule K-1s, chaos broke out.

(PAGEID # 3952.)  She referred them to the accountant.  (PAGEID # 3954.)  She was shocked

when she went to the bank and learned that Imperial had more than one bank account.  There

were five separate accounts.  (PAGEID # 3957.)  No one ever told her about the "Forever Now"

bank account.   In March 2013, investors sued.  (PAGEID #  3957.)  Petitioner told Bailey to

erase her e-mails.  (PAGEID # 3957-58.)  She gave her computer to Reg Martin, the receiver,

and he locked her out of her e-mail.  (PAGEID # 3958.)  Defendants still owed her

approximately $15,000.00.  (PAGEID # 3960.)

Shaffer Smith, a singer, songwriter, learned about the potential investment in OXYwater

in 2011, from his business manager, Kevin Foster.  On July 7, 2011, Smith invested $ 2.5 million

in the company.  (PAGEID # 4006, 4012.)  Smith expected to start receiving yearly dividends in

approximately two years.  (PAGEID # 4008-09.)  Smith never met the Petitioner, however, and

all of his conversations regarding his investment were with Kevin Foster.  (PAGEID # 4015.)

He had a civil lawsuit pending against Foster at the time of trial.  (PAGEID # 4017.)

$250,000.00 of Smith's money went to Foster; and on the same day that Smith's money was deposited into the Imperial bank account, $600,000.00 of it was transferred into the "Forever Now" bank account. (PAGEID # 4021, 4024.)

Joseph Crispin, a professional basketball player, learned about OXYwater through Shaun Stonerook, who also had invested in the company. (PAGEID # 4027-28.) Crispin specifically dealt with the Petitioner, and relied on false representations made in the PPM in making his decision to invest. (PAGEID # 4029, 4031.) Crispin also tasted the product, and thought that it tasted good. Petitioner told Crispin that former Vitaminwater and Coca Cola employees would be working for Imperial. Petitioner said that his salary would be $90,000.00. (PAGEID # 4031-32.) Crispin invested $100,000.00 in September 2011. (PAGEID # 4033.) Crispin received e-mail updates from the Petitioner and Harrison indicating that the company was doing well, and would be profitable in 2013. (PAGEID # 4036.) However, Crispin never received any dividends, as promised. (*Id*.) Crispin invested an additional $75,000 in December 2012. (PAGEID # 4036.) At that time, he was communicating regularly with Petitioner. Petitioner offered him a "1% discounted rate" of investment, telling Crispin that he did not draw a salary from OXYwater because he did not want to "stress the company", but would when "15 million" came in shortly, and sold "small portions of my personal stake to keep me floating. I had a guy who was going to buy a portions [sic] of my equity today but something happened and he no longer can." (PAGEID # 4039.) Petitioner offered to sell him "a solid 1.5% stake from my personal position for 125k." (PAGEID # 4040.) Petitioner assured Crispin that he could sell it back "when the fifteen million come in." (PAGEID # 4041.) Petitioner offered Crispin an "5% finders fee" if Crispin got other people to invest. (PAGEID # 4043.) Crispin had no reason to believe that Imperial was struggling financially when he made his second investment in the

company.  He had continued to receive very positive updates from the Petitioner and trusted him. (PAGEID # 4048.)  Petitioner asked for a Schedule K-1 for 2011, and for 2012, but did not receive it.  (PAGEID # 4049.)  It listed his capital contribution at only $15,000.00.  (PAGEID # 4050.)  He knew nothing about the "Forever Now" account, and did not know that his money was going anywhere but to Imperial.  (*Id*.)[7]

Daniel Couts, who had worked in the beverage industry for approximately nine years, met with Defendants in 2010 or 2011, and gave them advice on how to grow the company. (PAGEID # 4073, 4077-78.)  He told them it would take seven to ten years for company to become well established.  (PAGEID # 4078.)  He declined to work with them, but gave them the names of other potential recruits.  (PAGEID # 4080-81.)  Nonetheless, the PPM identifies Couts as the company's National Sales Manager, and includes information obtained from his resume that he provided to Harrison.  (PAGEID # 4086-87.)  He did not know that they had referred to him in their materials as their national sales manager until he spoke with the FBI.  (PAGEID # 4090.)

Matthew Godsey worked as the District Sales Manager for Fiji Water Company, and sent his resume to OXYwater when he got laid off.  He never heard back from them.  (PAGEID # 4104-05.)  Nonetheless, the identified him as their Area Sales Manager, and used information obtained from his resume without his permission.  (PAGEID # 4107-08.)  He never worked for them, and learned about it from the FBI.  (*Id*.)

---

[7] On cross-examination, Crispin stated that Robert Smith mailed him the PPM.  He tasted OXYwater, and it tasted good.  His wife thought it tasted good too.  (PAGEID # 4054-55.)

Michael Skelton, Jr. sent his resume to Couts for potential employment with OXYwater, and never heard back from them. (PAGEID # 4117-18.) Nonetheless, they identified him as a National Account Manager, using information obtained from his resume. (PAGEID # 4120.)

Shaun Andrew Stonerook, a basketball player in Europe, learned about Imperial from his friend, Kenny Gregory, and then talked to Robert Smith. (PAGEID # 4128-30.) Smith gave him a presentation and told Stonerook that former employees from Vitaminwater and Coke would be working with the company. (PAGEID # 4131.) Stonerook spoke with Petitioner before he invested. (PAGEID # 4133.) Petitioner told him OXYwater was oxygen enhanced, basically like vitamin water with oxygen in it. The label for the bottle containing the product said: Oxygen enhanced beverage. (PAGEID # 4134.) Petitioner told him the enhanced oxygen made the OXYwater product special and new. (PAGEID # 4134-35.) Petitioner told him that they had a machine, and used a special process whereby they trapped extra oxygen in the water. (PAGEID # 1435.) Petitioner told him that former employees from Vitaminwater and Coke would be working with the company. (PAGEID # 4136.) He relied on this information in making the decision to invest, and on the false misrepresentations contained in the PPM. (PAGEID # 4136-38.) Petitioner also told him they had celebrity endorsements, such as Manny Pacquiao, Greg Jennings, and a couple of NFL players. (PAGEID # 4144-45.) Petitioner assured him that they would not spend any of his investment money until they had raised $ 9.5 million. (PAGEID # 4148.) Petitioner advised Stonerook that defendants' total salary would be about $ 150,000.00. (PAGEID # 4151.) Petitioner would be paid $90,000.00 per year. (PAGEID # 4151.) Harrison would be paid $60,000.00 (*Id*.) Stonerook invested a total of $750,000.00 in three installments. (PAGEID # 4152.) Stonerook persuaded his friends to invest just under $ 5 million. (PAGEID # 4156.) He never got his money back. (PAGEID # 4157.)

On February 4, 2012, he received an e-mail from Petitioner telling him that they needed more money for marketing purposes. (PAGEID # 4164-65.) At that time, it was Stonerook's understanding that they had already raised $9.5 million, but Petitioner said that he needed $315,000.00. (PAGEID # 4165.) Petitioner said he would pay Stonerook a return of 10% in 30 to 90 days, and 20% in 90 to 120 days. (*Id*.) Petitioner told him Kevin Foster would be investing $ 45 million, and so they just needed the money short term. (PAGEID # 4167.) In response to Stonerook's questions, Petitioner sent a message stating that they had a 40,000 square foot production facility, 15 employees, and that they were marketing the product. "Money doesn't just sit around anymore we have expenses. . . . We were offering you a short term investment to get this campaign started and was going to pay you back as the rest of Kevin's money comes in." (PAGEID # 4168.) Petitioner already owed him $1 million at that time, and he did not invest further. (PAGEID # 4170.) In July 2012, Stonerook was considering making another investment, and Petitioner sent him e-mail messages indicating that they had "some good sales numbers" but that the "school system deal" was on hold because they had "missed production runs." (PAGEID # 4174.) In September 2012, Petitioner sent Stonerook more messages, indicating that they needed more money, and that he would give Stonerook a 10% commission on any money he obtained. (PAGEID # 4180-81.) Stonerook requested to see the sales numbers. He had been told that they were "doing millions of dollars in bottle sales." (PAGEID # 4184.) "While our funding has stalled our distribution has not! OXYwater is at the Natural Produce Expo in Baltimore MD" and has picked up 100 new health stores. (PAGEID # 4186-87.) In 2013, Stonerook requested his K-1, for taxes. He had not received them since 2011, when he first invested. (PAGEID # 4187.) When he received it, it indicated that he had only invested $38,750.00. (PAGEID # 4188.) He met with Petitioner, who assured him that the

company was doing well. He requested to see the books and records but did not receive them. When he did, he was not satisfied with what he saw. (PAGEID # 4191-92.) For example, records indicated that on November 18, 2011, they paid $50,000.00 to the formulator. (PAGEID # 4196.) On that same date, $50,000.00 went to "Forever Now." He did not know anything about "Forever Now." (Id.) On August 4, 2011, another $40,000.00 was paid for a formulator fee. On August 4, 2011, another formulator fee for $40,000.00. (PAGEID # 4197-98.) On November 7, 2011, $35,000.00 to "Forever Now" for a formulator fee. (PAGEID # 4199.) On July 11, 2011, $600,000.00 to "Forever Now" as payment to formulator for proprietary blend. (PAGEID # 4200.)[8]

Liam Culman invested in OXYwater after talking to Kevin Foster. (PAGEID # 4234.) Culman met Petitioner in August 2012. (PAGEID # 4239.) They discussed the company's relationship with Cleveland Cavaliers, and how Petitioner wanted to get with NASCAR. (PAGEID # 4240.) Thereafter, Petitioner was his primary contact. (PAGEID # 4241.) In November 2012, Culman received the Received LLC Offering Memorandum from Petitioner. (PAGEID # 4243-44.) Petitioner told Culman that they had raised $4.5 million since May 2011, and had $3 million in gross sales. (PAGEID # 4244.) Petitioner told Culman that he needed $2 million from him within the next week. (PAGEID # 4245.) The projected sales for 2013 were listed at $176 million, with a gross profit of over $246 million. (PAGEID # 4246.) Projected revenue for 2014 was listed at $743 million. (PAGEID # 4247.) He told Petitioner that the numbers were too high. (Id.) In December 2012, Petitioner sent him a series of e-mails stating that they had a group of people investing $15 million in the end of January. (PAGEID # 4251.)

---

[8] On cross examination, Stonerook stated that Robert Smith provided the presentation regarding the company and mailed him the PPM. (PAGEID # 4202-04.) Robert was the "pitch guy" for a while. (PAGEID # 4204.)

Culman requested the financials and wanted to speak with their accountant.  (PAGEID # 4254.)

Petitioner informed him that they were "deeply offended" and wished him the best of luck.

(PAGEID # 4256.)  Thereafter, they talked, and Petitioner sent him a document indicating that

the total gross sales for 2012 was in the amount of $2.9 million, with a net profit of $762,000.00.

(PAGEID # 4256-57.)  About a week later, in December 2012, Culman invested $500,000.00.

(PAGEID # 4258.)

Gregory Jennings, who played wide receiver for Green Bay Packers, heard about

OXYwater from Jonathan Stevens.  (*Transcript, Vol. IV*, ECF No. 142, PAGEID # 4274.)

Jennings met with Petitioner and Harrison.  (PAGEID # 4275-76.)  They told him that they had

acquired a lot of employees from Vitaminwater and presented a "pitch book."  (PAGEID #

4277.)  It indicated that Jonathan Stevens was a part of the team and that other athletes, including

Eric Weems and Manny Pacquiao, had endorsed OXYwater.  (PAGEID # 4278-79.)  Petitioner

and Harrison told him that Manny Pacquiao would be wearing OXYwater logo on his apparel in

his upcoming fight.  Jennings watched fight.  Pacquiao did not wear any OXYwater apparel.

(PAGEID # 4279.)  He decided not to invest in or endorse the product.  (PAGEID # 4279-80.)

On May 17, 2011, he sent them a letter so informing them.  (PAGEID # 4280-81.)  Nonetheless,

they identified him as a celebrity endorser of the product.  (PAGEID # 4282-83.)

Jon Ryzenga, a certified public accountant, prepared the partnership income tax return for

Imperial in November 2012.  (PAGEID # 4290.)  He also prepared multiple K-1s.  (PAGEID #

4291.)  Petitioner was identified as the contact person for Imperial.  (PAGEID # 4292.)  He met

with Meredith Bailey, the bookkeeper.  (*Id*.)    He asked for income and expenses for preparation

of 2011 return.  (PAGEID # 4295.)  He received information from Bailey indicating that

$1,250,000.00 was invested in the company in 2011.  (PAGEID # 4298.)  She sent him a profit

and loss statement indicating they had no debt, and cash outflows of $1.844 million. (PAGEID # 4300.) Gross sales were a little over $55,000.00. (PAGEID # 4301.) On Janury 8, 2013, Petitioner sent him an e-mail verifying that there was a total of $1.25 million invested in 2011 to be allocated based on ownership percentages. (PAGEID # 4304.) Bailey forwarded Ryzenga an e-mail from Petitioner telling her to "get away from totals." (PAGEID # 4306.) She forwarded another e-mail from Petitioner indicating they had received $2.5 million from one person. (PAGEID # 4307.) Through several e-mails with Bailey, they agreed upon the equity contributions for 2011. (PAGEID # 4309.) Petitioner's capital contribution was $900,000.00, as was Harrison's. (PAGEID # 4311-12

Arika Boetcher with Huntington National Bank remembered Lovena Harrison. (PAGEID # 4341-42.) Lovena had a business account in name of "Forever Now LLC." (PAGEID # 4342.) It was listed as a child development business. (PAGEID # 4343.) Lovena made frequent withdrawals, multiple times during a month from the account in amounts over $ 3,000 but under $ 10,000. (PAGEID # 4344; 4348-53.) She told Boetcher that the money was being used for school. (PAGEID # 4353.)[9]

The defendants hired Brian Dworkin's company to produce the OXYwater, and he did two production runs. (PAGEID # 4363-65.)  They produced less than 10,000 cases the first production, and five or six thousand cases the second run. They were initially supposed to be producing 100,000 cases for Walmart but it turned to almost nothing in the end. (PAGEID # 4365-66.) There were 12 bottles in each case. (PAGEID # 4366.) Imperial ran out of money to pay for the second production of OXYwater. They never did pay for it. Dworkin tried to sell it.

---

[9] The videotaped deposition of James Haszinger was played for the jury, but has not been made a part of the trial transcript.

(PAGEID # 4367-68.)  It was marketed as having added oxygen.  (PAGEID # 4368.)  They sent him a machine that was supposed to add oxygen to the water.  (PAGEID # 4373.)  He gave the machine and the leftover product to the FBI.  (PAGEID # 4374.)[10]

Imperial went into receivership in March 2013.  (*Transcript, Vol. IV*, ECF No. 142, PAGEID # 4377.)

Kimberly Hope Shaffer testified as an expert in hydrology and the testing of oxygen in water.  (PAGEID # 4395.)  She tested the OXYwater product, and said that the amount of dissolved oxygen in water does not matter for purposes of human consumption.  (PAGEID # 4404-05.)  Her test results indicated that distilled water contained more oxygen than OXYwater, as did tap water.  (PAGEID # 4410-11.)

Special Agent David James Gosiewski with the Criminal Investigation Division of the IRS began his investigation in this case in late 2012, and concluded it in May 2014.  Based on his investigation of bank records, Petitioner had no money invested in the company.  (*Transcript, Vol. V*, ECF No. 143, PAGEID # 4444.)  Neither did Harrison.  (*Id*.)  Imperial had at least 6 bank accounts, at Chase Bank and at Wells Fargo.  "Forever Now" had an account at Huntington National Bank, which closed, and transferred to a "Forever Now" account at Chase Bank.  (PAGEID # 4449.)  Gosiewski reviewed the business records.  (PAGEID # 4452.)  They reflected total sales in the amount of $307,000.00 in 2012.  (PAGEID # 4454.)  He went to the Harrison's home.  They had a pool.  Bank records indicated that it was purchased with funds from the "Forever Now" bank account at Chase.  (PAGEID # 4457.)  There was a check payable to Envision Pools dated August 28, 2012, from the "Forever Now" bank account in amount of

---

[10] On cross-examination, Dworkin acknowledged that he dealt with Derrick Flood and David Graham, never with the Petitioner.  (PAGEID # 4375-76.)

$31,453, and another dated September 10, 2012, to Envision Pools for $34,035, and another in the amount of $7, 535. They were were signed by Lovena Harrison. (PAGEID # 4458-59.) Bank records showed that the Harrison's wrote checks from that account to pay for home repairs, landscaping, expenses for a gym in the home, and a gun safe. (PAGEID # 4459-60, 4464-65.) There was approximately $20,000 in cash in the gun safe in located in their home. (PAGEID # 4466.) Records also reflected a purchase from Jared Gallery of Jewelers for almost $ 10,000 in July 2011. (PAGEID # 4467.) The "Forever Now" account also was used to make purchases at Vance Outdoors, a Cadillac Escalade, and a BMW. (PAGEID # 4472-80.) Government's Exhibit A reflects that John Crispin invested $100,000.00; Shaffer Smith invested $2.5 million; and Shaun Stonerook invested $250,000.00. Total investments in the company was $9 million. (PAGEID # 4482-85.) Wire transfers were made by Petitioner in amounts of tens of thousands of dollars to the "Forever Now" accounts, one in the amount of $600,000.00. (PAGEID # 4485-86.) The "Forever Now" account was used to make purchases for living expenses, and wine. (PAGEID # 4486.) Many of the wire transfers from the Imperial bank accounts to "Forever Now" had a notation in the memo line of salary. (PAGEID # 4493.) The K-1 amounts for specific investors were much lower than the actual amounts contributed by those investors during the calendar year 2011. (PAGEID # 4499.) Petitioner reported his gross income of $361,864 from Imperial Health Products on his tax returns. (PAGEID # 4504.) The total amount of transfers from the Imperial bank accounts to "Forever Now" in 2011 was $1.3 million. (PAGEID # 4509.) The company went into receivership March 2013. (PAGEID # 4516.)[11]

---

[11] On cross examination, Gosiewski testified, *inter alia*, that Imperial initially used Winona Foods to bottle their product, and several production runs were made through Winona foods. (PAGEID # 4522.) Petitioner was not a signator on the "Forever Now" account, and could not withdraw any money from that account. (PAGEID #4523.) Jon Ryzenga prepared the

The record does not support Petitioner's claim of the denial of the effective assistance of counsel. The record does not indicate that his attorney performed in a constitutionally ineffective manner, or that she failed to present any evidence that could have assisted the defense. Likewise, the record does not support Petitioner's claim that his attorney acted unreasonably, or that he was prejudiced by her failure to request to withdraw or join in his request for new counsel.

> [C]ourts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, *Strickland,* 466 U.S. at 689, and . . . the Sixth Amendment entitles criminal defendants to effective assistance of counsel, not a perfect defense. *See e.g., Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001) ("Instead of requiring perfect performance, then, we must permit a wide range of professionally competent assistance") (internal quotation marks and citation omitted); *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995) (en banc ) ("The test for ineffectiveness is not whether counsel could have done more; perfection is not required."); *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) ("there are countless ways to provide effective assistance in any given case and [ ] even the best criminal defense attorneys would not defend a particular client in the same way") (internal quotation marks and citations omitted); *Marshall v. Hendricks*, 313 F. Supp. 2d 423, 439 (D.N.J. 2004) ("[The first prong of the *Strickland* standard] does not require that a defendant receive perfect representation, but it does require that counsel act with the wide range of reasonable professional assistance.") (internal quotation marks and citations omitted).

*Cowans v. Bagley*, No. 1:00-cv0618, 2008 WL 4452578 (S.D. Ohio 2008). Further, "[u]nder *Strickland*, we must presume that decisions of what evidence to present and whether to call or question witnesses are matters of trial strategy." *Cathron v. Jones*, 77 F. App'x 835, 841-42 (6th Cir. 2003) (citing *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002)). As discussed, the Constitution does not guarantee petitioner the best or most perfect defense. *Scott v. Mitchell,* 209

---

K-1s based on information he obtained from Meredith Bailey. (PAGEID # 4532-33.) $249,000.00 was transferred back from "Forever Now" to Imperial's bank accounts. (PAGEID # 4543.) There appear to have been thousands of legitimate business expenses made from the Imperial bank accounts. (PAGEID # 4548.) They had contracts in place with various people, including FASLane Racing (related to NASCAR), the Cleveland Cavaliers, the Texas Rangers, Walgreens, and Discount Drug Mart . (PAGEID # 4550.) They had employees on the payroll getting contracts in place, and setting up marketing and advertising events. (PAGEID # 4551.)

F.3d 854, 881 (6th Cir. 2000) ("[T]he Constitution guarantees competent counsel and a fair trial,

not perfection.")

> [T]he Sixth Amendment] does not guarantee [ ] an excellent lawyer. It does not even guarantee [ ] a good lawyer. Instead, the Sixth Amendment right to the effective assistance of counsel entitles [the criminal defendant] to nothing more than a reasonably competent attorney whose performance falls within the [wide] range of competence demanded of attorneys in criminal cases.

*Nichols v. United States,* 563 F.3d 240, 248 (6th Cir. 2009) (quoting *Moran v. Trippett*, 149 F.3d

1184 (table), 1998 WL 382698, at *5 (6th Cir.1998) (citation and quotation marks omitted).

> When counsel focuses on some issues to the exclusion of others, there is a strong presumption that [s]he did so for tactical reasons rather than through sheer neglect. *See Strickland*, 466 U.S., at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (counsel is "strongly presumed" to make decisions in the exercise of professional judgment). That presumption has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in which a court "may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive." *Massaro v. United States*, 538 U.S. 500, 505, 123 S.Ct. 1690, 1694, 155 L.Ed.2d 714 (2003). Moreover, even if an omission is inadvertent, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight. *See Bell, supra*, at 702, 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914; *Kimmelman v. Morrison*, 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *Strickland, supra*, at 689, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *United States v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). To recall the words of Justice (and former Solicitor General) Jackson: "I made three arguments in every case. First came the one that I planned—as I thought, logical, coherent, complete. Second was the one actually presented—interrupted, incoherent, disjointed, disappointing. The third was the utterly devastating argument that I thought of after going to bed that night." Advocacy Before the Supreme Court, 37 A.B.A.J. 801, 803 (1951).

*Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).

Petitioner has failed to establish the denial of the effective assistance of counsel based on

his attorney's performance at trial or her failure to request to withdraw. The record entirely fails

to support these claims.

Claims one and three are without merit.

**B. Failure to Move for a Severance or Mistrial**

Petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to move for a severance or mistrial following admission of prejudicial and inflammatory evidence that was not admissible against him, specifically, evidence indicating that co-defendants Preston and Lovena Harrison withdrew large amounts of money, including one withdrawal in the amount of $600,000.00 from investor funds, and purchased lavish personal items, such as a Cadillac Escalade, a BMW, jewelry, a swimming pool, a home gym, firearms and a gun safe. Petitioner maintains that this evidence would not have been admissible against him, and cause him undue prejudice, because evidence indicated that he used his salary for living expenses and to pay off debt. This claim, likewise, is not persuasive.

Under Rule 8 of the Federal Rules of Criminal Procedure, two or more defendants may be charged in the same indictment or information "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Plainly, such are the circumstances here. Petitioner was charged with conspiracy to commit wire fraud and money laundering. Rule 14 provides that, if the joinder of defendants appears to prejudice a defendant, the court may order separate trials. Severance, however, is appropriate "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilty or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). "Severance of a trial of defendants who were jointly indicted 'is an extraordinary remedy, employed only to alleviate 'a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *United States v. Carter*, No. 07-20309, 2012 WL 2680809, at *4 (E.D. Mich. July 6, 2012) (citing *United States v. Franklin*, 415 F.3d 537, 556 (6th

Cir. 2005) quoting *Zafiro*, 506 U.S. at 539). "Courts typically favor the joinder of defendants charged with participating in the same act or series of acts because it is more efficient than conducting separate trials." *United States v. Gibbs*, 182 F.3d 408, 434 (6th Cir. 1999) (citing *Zafiro*, 506 U.S. at 537). "Courts presume that juries are capable of sorting out the facts relevant to each individual defendant's case." *Id*. (citation omitted). "A defendant seeking severance at trial from co-defendants bears a strong burden and must demonstrate substantial, undue, or compelling prejudice." *Franklin*, 415 F.3d at 556 (citing *United States v. Davis*, 177 F.3d 552, 558 (6th Cir. 1999)).

The Court is not persuaded that Petitioner can meet this standard here, particularly in view of the evidence set forth above. The record reflects neither that the Court would have granted a request for a severance of charges, or that Petitioner was unduly prejudiced by admission of evidence that the Harrison's used money that Petitioner deposited in the "Forever Now" bank account from investors in Imperial for lavish personal expenses.

## C. Ineffective Assistance of Counsel at Sentencing

Petitioner asserts that he was denied the effective assistance of counsel at sentencing, because his attorney failed to seek a continuance for application of an amendment to U.S.S.G. § 2B1.1(b), which, at the time Petitioner was scheduled to be sentenced, provided for a 20-level increase in his recommended Guideline sentence based on a loss of more than $7,000,000 but less than $20,000,000. U.S.S.G. § 2B1.1(b)(1)(K). See PreSentence Investigation Report, ¶ 46. Under amendments to the loss table in § 2B1.1(b) effective November 1, 2015, Petitioner would have received an 18-level increase to his recommended Guideline sentence under this provision. (*See Government's Sentencing Memorandum*, ECF No. 148, PAGEID # 4920-21); 2015 Amendments to U.S.S.G. § 2B1.1(b). Petitioner additionally asserts that he was denied the effective assistance

of counsel, because his attorney failed to challenge the government's calculation of loss on the basis that three of the alleged victims purportedly did not sign the PPM.

Attorney David F. Axelrod represented Petitioner at sentencing. In response to these allegations, the government has submitted the Declaration of David F. Axelrod indicating in relevant part as follows:

> While preparing to represent Mr. Jackson at sentencing, I was well aware of the amendment to U.S.S.G. § 2B1.1 on which Mr. Jackson relies, as reflected by *Defendant Thomas Jackson's Sentencing Memorandum* ("*Pet. Sentencing Mem.*") (Doc. # 147), which I filed with the Court approximately a week before his sentencing. There, I argued on Mr. Jackson's behalf:
>
> > [T]he Probation Office's recommendation does not account for the 2015 amendments to the guidelines which altered the loss table in 2B1.1(b)(1) to account for inflation. See Amendments to the Sentencing Guidelines at 13 (April 30, 2015). Although not yet effective, under the revised table, only 18 points [instead of 20] would be added to the offense level of an offender whose conduct resulted in a loss greater than $3,500,00 but less than $9,500,000. *Id*. Accordingly, under the amended guidelines, Thomas's guidelines range would be reduced to 78 to 97 months. Below, we ask for a downward variance to account for this and other factors.
>
> *Pet. Sentencing Mem.* at 6.
>
> I decided to proceed in this manner rather than requesting a continuance because, based on my lengthy experience with Judge Frost, who imposed sentence, I was confident that he would take the upcoming amendment into account in sentencing Mr. Jackson. As Mr. Jackson acknowledges, Judge Frost did so by granting a downward variance. *See Pet. Sentencing Mem.* at 10-11 (citing *Transcript of Sentencing Hearing*, PageID # 5405) and 35 (citing *Transcript of Sentencing Hearing,* PageID # 5471-73). Judge Frost specifically commented that it would have been "crazy for [him] not to take those into consideration." *Transcript of Sentencing Hearing*, PageID # 5473.
>
> Mr. Jackson also argues that there is a reasonable probability that Judge Frost would have varied downward to an even lower sentence, had Mr. Jackson's guidelines level already been reduce[d] by application of the amendment. . . . My view, however, was that regardless of the form in which I argued the amendment, Judge Frost would consider it and my other arguments in a holistic manner to impose a sentence that he believed "sufficient, but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. 3553(a)(2).

Mr. Jackson identifies three investors as not having signed the private placement memorandum: Kevin Foster, Shaffer Chimere Smith and Liam Cullman. *Affidavit of Thomas E. Jackson* ("*Jackson Aff.*") ¶ 30. There were, however, multiple reasons for not arguing to reduce the loss on this ground.

First, the argument was not particularly strong. That specific investors failed to sign the private placement memorandum does not mean that they were unaware of and not influenced by its contents, or by verbal representations by the defendants. The jury could have found that this was the case.

Furthermore, the Presentence Investigation Report ("PSR") did not list Kevin Foster as among the victims, and his investment was not included in the loss used for guidelines purposes. See PSR ¶ 27 ("Victim Impact"). Therefore, arguing that Mr. Foster did not sign the private placement memorandum could not have affected the guidelines loss.

On the other hand, Liam Culman's and Shaffer Smith's investments were included in guidelines loss. *See id*. But the argument that Mr. Jackson suggests was highly unlikely to succeed, and could have, among other things, provoked the government to argue that Mr. Jackson was not accepting responsibility with respect to those investors – especially since Mr. Smith's investment of $3.5 million accounted for approximately 40% of the guidelines loss.

In any case, lengthy experience has taught that it is rarely a good idea to challenge victims at sentencing, especially after a lengthy trial in which the Court has surely formed its own opinions about such matters. Therefore, I decided to focus on arguments that did not risk a negative reaction and/or had a greater likelihood of success, such as that the government was unable to prove loss with sufficient specificity, that loss is a poor proxy for culpability, that Mr. Jackson's offense level substantially overstated the seriousness of his offense, and that a significantly below-guidelines sentence would have been sufficient to ensure that 18 U.S.C. §§ 3553(a)'s objectives were met. *See generally Pet. Sent. Mem.* (Doc. 147).

(ECF No. 193-2, PAGEID # 5735-37.)

Petitioner had a recommended Guideline sentence of 97 to 120 months imprisonment. The probation officer recommended that he be sentenced to 108 months. Defense counsel objected to the 20-level increase in Petitioner's recommended sentence under U.S.S.G. § 2B1.1(b) in view of anticipated amendments to the sentencing guidelines. The Court agreed, and addressed the issue by departing downward in imposing sentence:

We've got 30 days and the new amendment coming into effect. Well, it's crazy for me not to take those into consideration. . . . I'm willing to take into consideration that, in November of this year, your total offense level would be 28, and a Criminal History Category I, which would place you in a 78 to 97 month sentencing range. And that helps you. And I'm willing to allow that to help you. I think I'd be remiss if I didn't.

(*Sentencing Transcript*, ECF No. 168, PAGEID # 5473-74.) The Court imposed an aggregate term of 83 months imprisonment. (*Judgme*nt, ECF No. 154.) Petitioner has failed to establish that he was denied effective assistance of counsel based on his attorney's decision to argue the issue at sentencing, rather than delay the proceedings by requesting a continuance for application of the 2015 amendments to the sentencing Guidelines.

Further, even assuming that certain investors did not actually sign the PPM, in view of the evidence submitted at trial, such an argument would not have assisted the Petitioner in establishing that they therefore were not victims of his illegal scheme, or that their financial loss was not attributable to him. Petitioner cannot establish a claim for ineffective assistance of of counsel on this basis.

**Recommended Disposition**

For the reasons set forth above, it is **RECOMMENDED** that this action be **DISMISSED**.

## Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or

in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation.* *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

 s/ *Elizabeth A. Preston Deavers*
Elizabeth A. Preston Deavers
Chief United States Magistrate Judge